# United States Tax Court

167 T.C. No. 4

PITON HOLDINGS, LLC, DAVID L. HALL, PARTNERSHIP
REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 637-23.                          Filed July 15, 2026.

————

P is an LLC that is treated as a partnership for federal tax purposes. P is subject to the centralized partnership audit regime established by the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, 129 Stat. 584. P claimed charitable contribution deductions under I.R.C. § 170 for its donations of a conservation easement and a fee simple interest in 2018. R sent P a Notice of Final Partnership Adjustment disallowing the charitable contribution deductions and determining penalties.

P allocated its claimed noncash charitable contribution deductions to four members. R contends that these four members do not reflect P's membership at the time of the charitable contributions.

P, citing *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), contends that the accuracy-related penalty R determined under I.R.C. § 6662 is not assessable as a matter of law because of the application of U.S. Const. amend. VII.

P contends that the I.R.C. § 6662(d)(2)(B)(ii) disclosure exception may apply (if all requirements are met) to the I.R.C. § 6662(e) and (h) valuation misstatement penalties at issue. R contends that the disclosure exception

is limited to the I.R.C. § 6662(d) substantial understatement penalty and does not apply to the I.R.C. § 6662(e) and (h) valuation misstatement penalties.

*Held*: The before value of the property was $1,440,000 or $3,800 per acre as determined by R's expert using the comparable property sales method. Subtracting the property's stipulated after value of $640,000 from the before value, the value of the easement was $800,000.

*Held*, *further*, P improperly allocated its claimed noncash charitable contribution deductions.

*Held, further*, because the claimed value of the easement exceeded the correct value by over 200%, P is liable for a gross valuation misstatement penalty under I.R.C. § 6662(h).

*Held, further*, as we held in *Riddle Aggregates, LLC v. Commissioner*, No. 31104-21, 165 T.C. (Dec. 15, 2025), the "public rights" exception to U.S. Const. amend. VII applies to the accuracy-related penalty under I.R.C. § 6662(a), (b)(1)–(3), (c), (d), (e), and (h), and this "public rights" exception also applies to the accuracy-related penalty under I.R.C. § 6662(a), (b)(1)–(3), (c), (d), (e), and (h) for BBA partnerships.

*Held, further*, the I.R.C. § 6662(d)(2)(B)(ii) disclosure exception does not apply to the I.R.C. § 6662(e) substantial valuation misstatement penalty nor to the I.R.C. § 6662(h) gross valuation misstatement penalty.

––––––––––

*William A. Stone III*, *Andrew W. Steigleder*, and *Michael B. Coverstone*, for petitioner.

*Ryan A. Ashburn, Logan T. Bohman, Ping Chang, Andrew J. Hagler, Caroline T. Parnass, Andrea S. Prigmore, Katelynn M. Sponseller*, and *Erin H. Stearns*, for respondent.

KERRIGAN, *Judge*:  This case is a partnership-level proceeding under the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, 129 Stat. 584, involving a syndicated conservation easement (SCE). Respondent issued a Notice of Final Partnership Adjustment (FPA) for tax year 2018 to David L. Hall, as partnership representative for Piton Holdings, LLC (petitioner).  In the FPA respondent for tax year 2018 disallowed petitioner's noncash charitable contribution deduction of $42,200,000 under section 170[1] and determined alternative penalties of $6,220,625 under section 6662(a), (b)(1)–(3), (c), (d), (e), and (h) and section 6662A.

After the parties' filing of Stipulations of Settled Issues,[2] the issues remaining for consideration are (1) the fair market value of the

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[2] In the Stipulation of Settled Issues filed October 29, 2024, respondent agreed not to challenge the following: (1) the conservation easement on the property places a restriction (granted in perpetuity) on the use which may be made of the real property under section 170(h)(2)(C) and the corresponding regulations; (2) the contribution of the conservation easement on the property is exclusively for conservation purposes pursuant to section 170(h)(1)(C) and the corresponding regulations; (3) the conservation purposes of the conservation easement on the property are protected in perpetuity pursuant to section 170(h)(5)(A) and the corresponding regulations; (4) the easement is a "qualified real property interest" pursuant to section 170; (5) during the tax year at issue Pelican Coast Conservancy, Inc. (PCC), was a tax-exempt entity pursuant to section 501(a) as an organization described in section 501(c)(3), was a qualified organization within the meaning of section 170(h)(1)(B), and had the experience and means to monitor and enforce the conservation easement on the property in perpetuity; and (6) during the tax year at issue Atlantic Coast Conservancy Properties, LLC (ACCP), was a tax-exempt entity pursuant to section 501(a) as an organization described in section 501(c)(3).  Additionally, the parties stipulated that (1) petitioner did not donate the conservation easement to PCC in a bargain sale and (2) petitioner did not donate the fee simple interest to ACCP in a bargain sale. Respondent conceded the accuracy-related penalty on reportable transaction understatements under section 6662A.

In the second Stipulation of Settled Issues filed on December 16, 2024, the parties stipulated that respondent has complied with the penalty approval requirements of section 6751(b)(1) by confirming timely supervisory approval of penalties under section 6662(c), (d), (e), and (h) for tax year 2018.

As stated in the third Stipulation of Settled Issues filed on April 16, 2025, for the purpose of this litigation respondent does not contend that petitioner failed to attach a qualified appraisal, as defined in section 170(f)(11)(E)(i) and corresponding

conservation easement, (2) whether petitioner properly allocated its claimed noncash charitable contribution deductions, and (3) whether petitioner is liable for an accuracy-related penalty under section 6662.

We hold that the fair market value of the land at the time of contribution was $1,440,000, that the value of the conservation easement was $800,000, and that petitioner did not properly allocate its noncash charitable contributions. Additionally, we hold that petitioner is liable for a 40% penalty for a gross valuation misstatement under section 6662(h).

FINDINGS OF FACT

Some of the facts are stipulated and so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference.

Petitioner is an Alabama limited liability company (LLC). Petitioner's principal place of business was Alabama when its Petition was timely filed. Absent stipulation to the contrary, appeal of this case would lie to the U.S. Court of Appeals for the Eleventh Circuit. *See* § 7482(b)(1)(E).

I. *History and Characteristics of the Property at Issue*

A. *The Meeks Mountain Property*

On September 13, 2012, DESE Properties, LLC (DESE Properties), a disregarded entity of DESE Research, Inc. (DESE Research), purchased 662.42 acres of land in Madison County, Alabama (Parent Parcel), for $1,059,872, or $1,600 per acre. DESE Properties referred to the 662.42 acres of land that make up the Parent Parcel as the "Meeks Mountain property." In 2017 and 2018 the chief executive officer of DESE Research was Wallace Kirkpatrick. At the time of purchase Dr. Kirkpatrick believed that the land was good for hunting

---

regulations, to its Form 1065, U.S. Return of Partnership Income, for the tax year ending December 31, 2018, in support of its donation of a conservation easement to PCC or that petitioner failed to attach a qualified appraisal, as defined in section 170(f)(11)(E)(i) and corresponding regulations, to its Form 1065 for the tax year ending December 31, 2018, in support of its donation of a fee simple interest to ACCP. The parties stipulated that petitioner is entitled to a noncash charitable contribution deduction for the donation of the fee simple interest to ACCP and the fair market value of the 377.74 acres of land in Madison County, Alabama, after being encumbered by the conservation easement is $640,000.

and would make a smart investment. When it purchased the Parent Parcel, DESE Properties was aware that there were rock formations on the land. DESE Properties used the Parent Parcel for hunting and recreational purposes.

The property at issue (Property) is a rural, undeveloped 377.74-acre parcel that is a portion of the Parent Parcel. It has a rolling to steep topography, and the entire Property is wooded with several visible rock outcroppings. This type of property is often referred to as a greenfield site, which is undeveloped land that likely has minerals, but will require permitting, extensive land clearing, and infrastructure development before it becomes an operating quarry.

The Property's street address is in Huntsville, Alabama, but it is not within the city limits. It is in an unincorporated area, and it is not subject to any zoning restrictions. The Property is in a mixed-use neighborhood consisting of vacant timber tracts, recreational tracts, agricultural tracts, and some rural residential homes.

As shown below, the Property is in the southeast region of the Huntsville Metropolitan Statistical Area (MSA). It is approximately 19 road miles from downtown Huntsville, the largest city in the Huntsville MSA. The Huntsville MSA has experienced significant growth in the last several decades. According to the 2020 census, Madison County had a population of 388,153 people, of whom 215,043 resided in Huntsville.



### B. *Limestone Mining in Alabama*

As of December 27, 2018, there were 18 active limestone quarries within 50 miles of the Property, 8 of which were within 25 miles of the Property. As of December 31, 2018, Vulcan Materials Co. (Vulcan) operated at least six limestone quarries in Northern Alabama counties, including Madison, Morgan, Jackson, and Dekalb. Vulcan is the largest producer of construction aggregates in the United States. Two of Vulcan's limestone quarries are in Madison County: the Huntsville Quarry, which has operated continuously for many years, and the Gurley Quarry, which has operated continuously since it was opened in February 2013.

Of the crushed stone sold or used by Alabama producers in 2018, 86% was limestone and 14% was other types of aggregate such as dolomite, granite, and sandstone. The Alabama Department of Transportation (ALDOT) provides specifications to determine the quality of quarried materials for construction aggregate. Limestone aggregate has a low value-to-weight ratio because it is costly to transport over distances on account of its weight and bulkiness relative

to its economic value. Aggregates are generally produced close to where they are consumed because transportation costs play a significant role in the delivered price of aggregates.

II.    *Individuals and Entities Involved*

A.    *OSI and OSI-Affiliated Entities*

Matthew Ornstein and Frank A. Schuler IV are promoters of SCEs.[3] As part of their business ventures, Messrs. Ornstein and Schuler created or directed the creation of many LLCs for which, for the purposes of this case, the parties agreed to use the term "OSI-affiliated entities." Ornstein-Schuler Investments, LLC (OSI), was an OSI-affiliated entity that Messrs. Ornstein and Schuler used to effect their SCE transactions during the relevant period.

Matthew Kaynard is an attorney with an LL.M. in taxation who served as the chief operating officer and general counsel of OSI in 2017 and 2018. Ryan Ellison was a vice president at OSI in 2017 and 2018. Herbert Brown is an attorney with an LL.M. in taxation who served as the assistant general counsel and director of security and tax compliance for OSI in 2017, 2018, and 2019.

For the purpose of this Opinion the Court will refer to Messrs. Ornstein and Schuler, OSI-affiliated entities, and relevant employees of Ornstein-Schuler Investments, LLC, collectively as OSI unless it is necessary to specifically reference a particular entity or individual.

B.    *Piton Holdings, LLC (Petitioner)*

Petitioner was formed on May 10, 2017, as an Alabama LLC and is the property-owning entity (PropCo) in this transaction. As of December 27, 2018, petitioner's managers had no experience operating a limestone quarry. Additionally, petitioner had no employees with mining experience and had not hired a third-party company to assist in the management of a limestone quarry on the Property.

---

[3] "Promoter" is sometimes viewed as a loaded term in the tax world because of the penalty imposed by section 6700(a) for "[p]romoting abusive tax shelters." In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether the activities of Messrs. Ornstein and Schuler, or of the entities they managed, would subject them to a civil penalty under section 6700(a), a question that is not before us.

C.     *Piton Group*

Piton Group, LLC (Piton Group), is an LLC that served as the investment company in this transaction, meaning it was the entity that was used to raise money from outside investors.

D.     *1908 Capital, LLC, and 1908 Capital PG*

Sean O'Toole and James Comerford formed 1908 Capital, LLC (1908 Capital), in 2017 "to facilitate economic development and smart conservation." 1908 Capital's role was to raise capital for the project. Messrs. O'Toole and Comerford created 1908 Capital PG, LLC (1908 Capital PG), to purchase membership interests in petitioner from OSI and then to serve as the manager for Piton Group and petitioner. Mr. Hall, petitioner's partnership representative, worked for 1908 Capital in 2018.

E.     *DESE Properties, LLC, and DESE Research, Inc.*

DESE Properties is a disregarded entity of DESE Research. DESE Properties' business purpose is to hold recreational and investment properties. Buying and selling real estate was a hobby of Dr. Kirkpatrick's. DESE Properties purchased or sold 18 properties between 2016 and 2018, 8 of which were in Madison County.

III.     *Background of the Transaction*

A.     *DESE's 2017 Discussions and Transaction with OSI*

On May 15, 2017, Mr. Ellison of OSI asked Bruce Berry, a real estate broker who did work on behalf of Dr. Kirkpatrick, to provide him with a list of information so that he could draft a purchase and sale agreement for property owned by Dr. Kirkpatrick. Mr. Berry provided him with information about the Parent Parcel, including that DESE Properties owned the land and that the purchase price was $2,200 per acre. On May 19, 2017, Mr. Ellison emailed Mr. Berry to inform him that OSI was interested in acquiring 289 acres of the Parent Parcel.

On June 3, 2017, Mr. Kaynard outlined the anticipated structure of the acquisition of 371 acres of the Parent Parcel, instead of 289 acres, in an email to Mr. Ellison. In his email Mr. Kaynard explained the requirements for petitioner to be formed as a partnership and that the proposed structure would preserve the long-term holding period for the real estate at issue. On June 6, 2017, Mr. Ellison emailed Dr.

Kirkpatrick describing the proposed structure. Mr. Ellison explained that a second DESE entity must be formed so that petitioner could be formed as a partnership before Longleaf Ventures, LLC (Longleaf), an OSI-affiliated entity, acquired its interest in the partnership.

On or about July 14, 2017, Mr. Ornstein, acting on behalf of Longleaf, and Dr. Kirkpatrick, acting on his own behalf and on behalf of DESE Research and DESE Properties, executed a Membership Interest Purchase and Sale Agreement (DESE MIPSA). The DESE MIPSA stated that DESE Research owned or would own by the time of closing a 99% interest in petitioner. The DESE MIPSA also stated that DESE Research would assign 98% of its membership interests in petitioner to Longleaf.

In exchange for a 98% interest in petitioner, Longleaf agreed to pay $816,000 to DESE Research in two payments. The first payment was a refundable earnest money deposit of $25,000, and the second payment for the remainder of the purchase price would be paid at closing. The DESE MIPSA established a "Due Diligence Period" of 120 days during which Longleaf would have "the right to evaluate the Subject Property . . . including . . . surface and sub-surface mineral rights related to said real estate, and to engage the services of accountants, attorneys, appraisers, forestry consultants, surveyors, etc."

The DESE MIPSA was amended twice. It was first amended on October 31, 2017, when the due diligence period was extended from 120 days to 300 days.

The second amendment to the DESE MIPSA, dated June 27, 2018, was made just before the closing of the transaction. The second amendment to the DESE MIPSA substituted the OSI-affiliated entity Natural Aggregates Partners, LLC (Natural Aggregates), for the OSI-affiliated entity Longleaf, substituted DESE Properties for DESE Research, increased the Property from a 371-acre parcel to a 377.74-acre parcel, and changed the anticipated ownership interests in petitioner. The DESE MIPSA provided that after the closing of the transaction DESE Research and Dr. Kirkpatrick would each retain a 1% interest in petitioner, while the second amendment provided that DESE Properties would retain a 1.5% interest and Dr. Kirkpatrick would retain a 0.5% interest. The DESE MIPSA provided that Longleaf would hold a 98% interest after the transaction's close, while the second amendment provided that Natural Aggregates would hold that 98% interest after the transaction's close.

B.    *ECS Report, S&ME Report, Blethen Report, and Appraisal*

While the discussions and first steps of the transaction between DESE Research and OSI were ongoing, various reports were completed. On or about August 2, 2017, Longleaf hired a third-party company, ECS Southeast (ECS), to prepare a Phase I Environmental Site Assessment Report for approximately 371 acres of land in Madison County, Alabama. On or about September 1, 2017, ECS provided Longleaf with a report entitled "Phase I Environmental Site Assessment Report, 371 Acres Madison County AL, Meeks Road, Huntsville, Madison County, Alabama 35803, ECS Project No. 49-4963-H, for Longleaf Ventures LLC."

On or about April 18, 2018, OSI hired S&ME Inc. (S&ME), a geotechnical, environmental, and construction services company, to drill two bore holes on the Property at locations OSI selected and develop a report (S&ME Report). The S&ME Report provides the results of laboratory tests that were performed on a composite sample of crushed stone taken from the two bore holes on the Property. According to the S&ME Report, "shale lenses were extracted" from the material before the remaining material was crushed into a composite sample and tested. ALDOT only allows a maximum of 2% composition of shale in coarse aggregate that is used in asphalt and cement mixes.

OSI hired Marvin Blethen to "analyze the feasibility of investing in a mining operation for crushed stone with potential uses for construction aggregate, road base, stabilized base, general fill, subgrade stabilization and general construction material." OSI provided Mr. Blethen a draft of the S&ME Report. Mr. Blethen prepared a June 26, 2018, report titled "Technical Due Diligence, Prefeasibility Study, Business Plan and Valuation, Piton Holdings LLC, Madison County, Alabama" (June Blethen Report). The June Blethen Report concluded the Property contains just under 89,750,000 tons of "Proven Mineral Resources" and that the Property's highest and best use is as a for-profit limestone mine.

On the basis of a discounted cashflow (DCF) analysis that used a 15-year period and a 12% discount rate, the June Blethen Report stated that a hypothetical limestone mine on the Property had a value of $42,258,000. The DCF analysis is based on the marketing and the selling of 400,000 tons of limestone into the market in year 1, 600,000 tons in year 2, and 900,000 tons in year 3, followed by a 3% increase in annual production for the next 12 years.

On June 20, 2018, OSI engaged Clayton Weibel from Weibel & Associates to prepare an appraisal of the Property. On or about June 21, 2018, Mr. Weibel provided OSI an appraisal report (June Appraisal) for the Property stating that the fair market value of the Property before the conservation easement was $42,190,000, the fair market value after the conservation easement was $565,000, and the fair market value of the conservation easement was $41,625,000. The June Appraisal relied on the June Blethen Report and the S&ME Report.

C.      *Closing of the DESE MIPSA*

On June 25, 2018, Mr. Kaynard sent a letter to Dr. Kirkpatrick's attorney explaining the final closing documents and "the order in which they should be executed." With the letter he enclosed a real estate sales validation form dated June 27, 2018, listing the "Actual Value" of the Property as $816,000.

Mr. Kaynard noted that the Initial Company Agreement of petitioner called for Dr. Kirkpatrick to contribute $4,100 cash capital. Mr. Kaynard stated in his letter that the final closing matter was that Dr. Kirkpatrick needed to write a personal check made payable to petitioner for $4,100 for a 0.5% ownership interest. Mr. Kaynard's letter explained that this additional $4,100 would be wired back to or a check would be cut to Dr. Kirkpatrick at closing. Between June 27 and 29, 2018, Dr. Kirkpatrick signed the closing documents, including the Initial Company Agreement. DESE Properties contributed the Property for a 99.5% interest in petitioner, and Dr. Kirkpatrick contributed $4,100 for a 0.5% interest in petitioner. OSI's final wire to the closing attorney was for $795,100, which, along with the $25,000 earnest money deposit, brought the total consideration exchanged to $820,100: $816,000 for 98% of the partnership interests and an additional $4,100 repaying Dr. Kirkpatrick's capital contribution. The Assignment of Membership Interests that was executed at the same time reflects that Natural Aggregates paid DESE Properties $816,000 as consideration for 98% of the partnership interests in petitioner.

This transfer and each subsequent transfer of a membership interest in petitioner was memorialized by a membership interest purchase and sale agreement. Additionally, with each transfer of a membership interest, petitioner's company agreement was amended to reflect the admission of the new member. With respect to the admission of new members, each iteration of petitioner's company agreement contained the following identical provision:

Except as provided in Section 8.4, each of the Members may make a Disposition of all or any portion of such Member's Membership Interest only with the prior written approval of the Manager and then only after complying with this Section 8.2. If any Member desires to sell all or any portion of his Membership Interest, the selling Member shall by Notice to the Manager offer to sell such interest to the Manager who shall have the right to purchase the entire offered interest.

D.      *1908 Capital's Involvement and Syndication*

On April 27, 2018, Mr. Kaynard emailed Messrs. Comerford and O'Toole of 1908 Capital about the Piton Holdings project. Mr. Kaynard stated that "Marvin Blethen has estimated an appraisal value of $40-45M for this project." This email predates the S&ME Report, the June Blethen Report, and the June Appraisal. On June 29, 2018, OSI provided 1908 Capital with the June Appraisal.

On July 23, 2018, OSI sent 1908 Capital a draft financial projection for Piton Group. The draft used the value of the conservation easement on the Property from the June Appraisal to estimate the potential tax deductions that could be sold to investors.

The draft provided that the final amount 1908 Capital would pay OSI would be determined by how much capital was raised in Piton Group. If Piton Group raised the maximum amount of $8,900,000, OSI would sell 98% of its membership interests in petitioner to 1908 Capital PG for $4,945,906. The draft indicated that 1908 Capital's fee would be 25% of the capital raised and the fee was projected to be $2,044,169. On or about August 7, 2018, OSI provided to 1908 Capital a draft of the Private Placement Memorandum (PPM) for Piton Group. OSI and 1908 Capital exchanged several copies of the PPM before it was finalized.

The finalized PPM, dated September 17, 2018, informed investors that Piton Group anticipated purchasing up to a "97% member equity interest in Propco . . . pursuant to the Membership Interest Purchase Option Agreement." It presented investors with four options for the Property: (1) develop the Property as a limestone quarry; (2) lease the Property to a third party that would operate a quarry on the Property; (3) conserve the Property; or (4) hold the Property for long-term appreciation and future sale.

The PPM represented to potential investors that developing the Property into a limestone quarry "could be a beneficial and profitable" investment but warned investors that this strategy involved significant risk because the development strategy involves "a highly complex, expensive, and potentially dangerous process of mining." It included additional warnings that petitioner would likely need to engage in significant borrowing or raising of capital if the development option was chosen. The PPM also pointed out that because of the possibility of there being a conservation easement on the Property, "only potential [i]nvestors who are not focused on maximizing the potential cash return from an investment in the membership interest in the Company should consider subscribing." Additionally, the PPM explained that the "placement of a conservation easement may create a charitable tax deduction for the members" of petitioner.

1908 Capital sent numerous marketing emails to potential investors related to its 2018 SCE projects, including Piton Group. Many of the emails to investors included documents that represented to investors that the projected internal rate of return for the development option was "35%/15 years." The same document also stated that the "Tax Incentive Option" would provide investors with a net tax benefit of 4.6:1, meaning that for every $1 contributed to Piton Group, the investor would receive a noncash charitable contribution deduction of approximately $4.60. 1908 Capital's emails explicitly warned potential investors that "substantial additional investment would be required to undertake a mining operation."

IV.    *December Transfers of Membership Interests*

A.    *Early December Distribution*

According to Exhibit A of the Amended Company Agreement, petitioner had three members as of June 29, 2018. Natural Aggregates had a 98% interest. DESE Properties had a 1.5% interest. Dr. Kirkpatrick had a 0.5% interest.

On December 3, 2018, Natural Aggregates distributed its 98% interest in petitioner to its partners, as follows: TOFT 49.995%, Province 49.995%, and Ornstein-Schuler LLC (OS LLC) 0.01%. Following this distribution Messrs. Ornstein and Schuler signed the First Amendment to the Amended and Restated Company Agreement of Piton Holdings, LLC.

B.     *1908 MIPSA and Piton Group MIPSA*

On December 27, 2018, at 3:26 p.m. central time OSI received $4,945,906 from a bank account affiliated with 1908 Capital with a reference line "Purchase of OSI Membership Interest."

On December 28, 2018, at 3:23 p.m. central time 1908 Capital PG received a wire of $1,700,000 from the same bank account with a reference line stating "Purchase Membership Interest PG." The same account wired $50,000 to 1908 Capital PG on January 9, 2019, at 3:31 p.m. central time with a reference line stating "Final MIPA2 Payment." Piton Group agreed to purchase a 97% interest in petitioner from 1908 Capital PG.

On its 2018 Form 8949, Sales and Other Dispositions of Capital Assets, 1908 Capital reported that it acquired "Piton Holdings LLC, 98 Units" on December 27, 2018, for $4,945,906 and sold its units on December 28, 2018, for $6,977,006.

On January 3, 2019, Mr. Brown, an OSI attorney, emailed 1908 Capital the closing documents for 1908 Capital PG's purchase of the membership interest from the three OSI-affiliated entities. The documents included (1) an undated Membership Interest Purchase and Sale Agreement between 1908 Capital PG, as purchaser, and OS LLC, TOFT, and Province, as sellers, (2) an undated Assignment of Membership Interest between TOFT, Province, and OS LLC and 1908 Capital PG, (3) an undated Second Amended and Restated Operating Agreement of Piton Holdings, LLC (Petitioner's Second Amended Company Agreement), (4) an undated Membership Interest Purchase and Sale Agreement between 1908 Capital PG and Piton Group, (5) an undated Third Amended and Restated Operating Agreement of Piton Holdings, LLC, and (6) a Professional Services Agreement between 1908 Capital PG and Natural Aggregates.

In the January 3 email Mr. Brown requested that 1908 Capital execute the documents attached to his email and scan copies back to him. In the email, he explained that the documents could be notarized in his office, and he instructed 1908 Capital not to date the documents because he "need[ed] to discuss dates with Matt K once he returns from vacation."

1.  *The 1908 MIPSA*

On or after January 3, 2019, 1908 Capital PG, as purchaser, and OS LLC, TOFT, and Province, as sellers, executed the final Membership Interest Purchase and Sale Agreement with a stated effective date of December 19, 2018 (1908 MIPSA).

In the 1908 MIPSA, TOFT, Province, and OS LLC purportedly agreed to sell to 1908 Capital PG an option to purchase between 95% and 98% of the membership interests in petitioner.  The 1908 MIPSA states:

> The rights and obligations of the parties hereunder shall remain in full force and effect without regard to, and shall not be affected or impaired by, (i) any amendment or modification of or addition or supplement to the Company Agreement, [or] (ii) any action or inaction in respect of the Company Agreement, or any exercise or non-exercise of any right, remedy, power or privilege in respect of such document or this Agreement . . . .

Further modification, amendment, or termination of the 1908 MIPSA could be accomplished only "by a written agreement between [1908 Capital PG] and [TOFT, Province, and OS LLC]."

The 1908 MIPSA provided that the price for the 1908 purchase option was $50,468 per percentage of membership interest purchased.  To exercise the purchase option, 1908 Capital PG was required to provide TOFT, Province, and OS LLC written notice of its election to exercise the option on or before December 27, 2018, and specify a date for closing.  The 1908 MIPSA required 1908 Capital PG to satisfy two requirements at closing: (1) deliver the purchase price to the sellers, and (2) execute Petitioner's Second Amended Company Agreement.

Specifically, the 1908 MIPSA provided:

> Upon receipt of the Purchase Price, Sellers shall execute and deliver such documents, assignments, instruments and other items, and shall take such other action, as shall be necessary to transfer and assign the Company Interest to the Purchaser, including, but not limited to, executing and delivering the Second Amended and Restated Company Agreement.

On or after January 3, 2019, Mr. Comerford signed Petitioner's Second Amended Company Agreement. Petitioner's Second Amended Company Agreement purported to admit 1908 Capital PG as a member of petitioner with a 98% membership interest, having purchased all of TOFT, Province, and OS LLC's interests. The preamble to the document contains a space to handwrite the effective date of the agreement, but it was left blank. The signature page of the document purports that it was notarized and executed on December 26, 2018.

### 2. *The Piton Group MIPSA*

On or after January 3, 2019, Piton Group, as purchaser, and 1908 Capital PG, as seller, executed the final Membership Interest Purchase and Sale Agreement with a stated effective date of December 26, 2018 (Piton Group MIPSA). In the Piton Group MIPSA, Piton Group agreed to purchase from 1908 Capital PG a 97% interest in petitioner for $6,990,075.[4] The Piton Group MIPSA states the purchase was "subject to the payment of the Purchase Price to [1908 Capital PG]."

On or after January 3, 2019, Mr. Comerford signed the Third Amended and Restated Company Agreement of Piton Holdings, LLC (Petitioner's Third Amended Company Agreement), on behalf of 1908 Capital PG and Piton Group. The stated effective date of Petitioner's Third Amended Company Agreement is December 26, 2018. Petitioner's Third Amended Company Agreement purports to admit Piton Group as a new member with a 97% membership interest.

## V. *Charitable Contribution and Petitioner's Tax Return*

### A. *Charitable Contribution*

On December 27, 2018, at 3:03 p.m. central time, petitioner recorded a deed of conservation easement in favor of PCC with the Probate Judge of Madison County, Alabama. Two minutes later, at 3:05 p.m. central time, petitioner recorded a warranty deed conveying its fee simple interest in the Property to ACCP with the Madison County Probate Judge.

---

[4] We acknowledge that the parties did not establish that Piton Group ever paid the full purchase price required under the Piton Group MIPSA for the 97% interest in petitioner. The parties do not dispute that Piton Group paid sufficient consideration for the 97% interest; therefore, we do not address this.

Petitioner claimed a $41,635,000 deduction for the donation of the conservation easement and a $565,000 deduction for the donation of the fee simple interest, for a total noncash charitable contribution deduction of $42,200,000.[5] Petitioner allocated the noncash charitable contributions as follows:

| Member | Allocation Percentage | Conservation Easement Donation Allocation | Fee Simple Donation Allocation |
|---|---|---|---|
| Piton Group | 97% | $40,385,950 | $548,050 |
| DESE Properties | 1.5% | 624,525 | 8,475 |
| 1908 Capital PG | 1% | 416,350 | 5,650 |
| Dr. Kirkpatrick | 0.5% | 208,175 | 2,825 |

Petitioner did not allocate any of its noncash charitable contributions to Natural Aggregates, TOFT, Province, or OS LLC.

B.    *Tax Return Appraisal*

Petitioner attached to its 2018 Form 1065 an appraisal (Return Appraisal) of the Property dated February 1, 2019, prepared by Mr. Weibel and Lucus M. Von Esh of Lucus Mason, Inc.

The Return Appraisal concludes that the Property's value before the conservation easement was $42,200,000, that the fair market value after the conservation easement was $565,000, and that the fair market value of the conservation easement is $41,635,000. The Return Appraisal also relies on the S&ME Report. Although the June Appraisal relies on the June Blethen Report, the Return Appraisal relies on a different report prepared by Mr. Blethen titled "Technical Due Diligence, Prefeasibility Study, Business Plan and Valuation, Piton Holdings LLC, Madison County, Alabama" that was dated December 1, 2018 (December Blethen Report). The December Blethen Report stated that a hypothetical mine on the Property had a value of $42,281,000 on the basis of a DCF analysis that was nearly identical to the DCF

_____

[5] The parties have stipulated that the after value of the Property is $640,000 and that petitioner is entitled to a noncash charitable contribution deduction of $640,000 for the donation of the fee simple interest.

analysis included in the June Blethen Report. The December Blethen Report similarly concluded that the Property contained nearly 89,750,000 tons of "Proven Mineral Resources" and that the Property's "highest and best use at this time is as a for-profit limestone mine."

## VI. *Summary of Expert Testimony*

### A. *Petitioner's Experts*

#### 1. *Henry Fishkind*

Henry Fishkind works for Fishkind Litigation Services, a company that provides litigation support and expert analysis. He assists clients with evaluating market demand and pricing for mining operations such as Vulcan. We recognized Dr. Fishkind as an expert on aggregate economics and market forecasting.

Dr. Fishkind's report and testimony focused on the projected market demand for limestone for a hypothetical quarry operating on the Property. He concluded that there was significant excess (net) demand in 2017–18 averaging 3,976,668 tons per year that a quarry at the Property would be competitively positioned to serve.

#### 2. *John Joseph Howle*

Joseph Howle had a 38-year career in environmental compliance, including 29-plus years with Vulcan. We recognized Mr. Howle as an expert in permitting and environmental compliance for aggregate mining in Alabama. Mr. Howle was responsible for interacting with the Alabama Department of Environmental Management (ADEM), the regulatory agency that issues air and water permits in Alabama.

Mr. Howle's testimony focused on the permitting process for limestone mining in Alabama. Mr. Howle concluded that the ADEM review timeline for air and water permits is approximately four to six months from submission to approval and that it is reasonably probable that all necessary permits for the Property would be obtained in that timeframe.

#### 3. *Gregory Gold*

Gregory Gold worked in the mining industry for over 22 years and has held various positions in the mining industry. Currently, he works at Stantec Consulting Services, Inc. (Stantec). We recognized Mr. Gold

as an expert on mining engineering, aggregate quarry operations, and mineral valuation.

His testimony focused on the value of the limestone on the Property if it were mined. He used the income method for his valuation conclusion rather than the comparable property sales method.

Mr. Gold developed a mine plan that includes two phases. Phase One involves the construction of a 15-acre permanent plant site as well as an access road. Phase Two involves the mining of the remainder of the pit, which occurs once the permanent plant is constructed. He concluded that the total costs of production would be $5.31 per ton during Phase One of the mine's operation and $4.77 per ton during Phase Two of the mine's operation. The mine would be operating during Phase One, but in a smaller area than in Phase Two. Mr. Gold calculated the fair market value of the economically recoverable limestone resource on the Property to be $39,500,000.

4. *Kyle Catlett*

Petitioner offered, and the Court recognized, Kyle Catlett as an expert on the appraisal of real estate in Alabama. Mr. Catlett is a certified general real estate appraiser in the State of Alabama. He holds the Member of the Appraisal Institute designation from the Appraisal Institute.

Mr. Catlett used the before and after valuation method, and concluded that the highest and best use of the Property was to develop it into a commercial limestone quarry. He used the income method known as the owner-operator income method to determine the before value of the Property. His DCF analysis modeled a 30-year mine life, reflecting 33,820,000 tons sold over the life of the mine, ramping up from 383,402 tons in 2020 to 1,508,689 tons in 2028 and 1.44% annual growth thereafter. He concluded total costs of production would be $6.25 per ton with a 3% increase each year. Using a discount rate of 15%, he calculated a net present value of approximately $32,130,000 from the Property's hypothetical cashflows, plus a present value of the reversionary interest of $2,410,000, for $34,540,000, equaling $91,439 per acre, as the before value of the Property being used as a hypothetical mine.

5.     *Derek Loveday*

Mr. Loveday is a geologist who works for Stantec. He has over 30 years of mining industry experience. We recognized him as an expert in geology and mineral resource valuation. His report was a rebuttal of Jackson Partlow's report.

His testimony focused on the geologic formations underlying the Property and the quality of the limestone resources on the Property. He reached the conclusion that two core holes and associated laboratory testing are sufficient to support an evaluation of limestone resources consistent with ALDOT specifications and requirements.

B.     *Respondent's Experts*

1.     *James Roger Ball*

The parties stipulated that James Roger Ball is an expert in real estate appraisal and the valuation of easements. Mr. Ball has decades of experience appraising land in Alabama and is a certified general real estate appraiser in Alabama.

Mr. Ball concluded that the highest and best use of the Property before being encumbered by the conservation easement was "recreational with all future development rights and mineral rights." He used the before and after valuation method to determine a fair market value of the Property's easement as of December 27, 2018, and concluded that the fair market before value of the Property was $1,440,000.

His valuation conclusion relied on the comparable property sales approach. He determined that this approach was the only one that would produce a credible value conclusion for the Property.

2.     *Jackson Partlow*

Jackson Partlow is a licensed professional geologist in Alabama and Georgia. He is a member of the American Institute of Professional Geologists, the International Institute of Mineral Appraisers, and the Society of Mining, Metallurgy, and Exploration. We recognized him as an expert in geology and mineral resource evaluation.

Mr. Partlow visited the Property and concluded that S&ME had performed too limited drilling and sampling to support a conclusion that the mineral resources on the Property were mineral reserves. He

concluded that the S&ME report was vague as to what portions of the materials within the S&ME samples pass the ALDOT standards because of the removal of shale lenses from the core samples. Additionally, he concluded that the December Blethen Report overstated the amount of limestone a hypothetical quarry on the Property would be able to sell. Mr. Partlow estimated the maximum amount that could be sold per year was 353,331 tons.

### 3. *Ryan Taylor*

Ryan Taylor has worked as a geologist since 2001. He is a registered professional geologist in the State of Georgia. Currently, he is a Program Lead and Professional Geologist with the Division of Minerals Evaluation of the Department of the Interior. The parties stipulated that Mr. Taylor was an expert in geology, mineral evaluation, mineral valuation review, and mineral market analysis.

In his report Mr. Taylor rebutted Mr. Gold's report and concluded that the Gold report is not consistent with mineral valuation standards and guidelines. He concluded that the laboratory testing performed by S&ME would not yield results representative of the material that could be mined on the Property because shale was removed from the sample cores. He observed that the amount of drilling conducted by S&ME was not sufficient to indicate the extent of the limestone resource on the Property. He found that the net present value in the Gold report is likely overstated.

## OPINION

### I. *Burden of Proof and Evidentiary Issue*

The Commissioner's determinations in a Notice of Deficiency or adjustments in a Notice of Final Partnership Administrative Adjustment (FPAA) are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). In 2015 Congress enacted BBA § 1101, 129 Stat. at 625–38, which amended the Code by striking the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, and enacting new provisions using many of the same Code section numbers as TEFRA. BBA § 1101(a), (c)(1), 129 Stat. at 625–37. The BBA generally governs partnership audit and adjustment procedures for

partnership returns filed for partnership years beginning after December 31, 2017.  BBA § 1101(g), 129 Stat. at 638.

Under the BBA, the FPA replaced the FPAA.  In the FPA the Commissioner makes final partnership adjustments and the partnership then has an opportunity for judicial review.  §§ 6231(a)(3), 6234(a); *see also Mammoth Cave Prop., LLC v. Commissioner*, No. 5401-24, 166 T.C., slip op. at 6 (Mar. 9, 2026).  The FPA and the FPAA are similar because they are jurisdictional notices which enable the partnership or tax matters partner to file a petition in a court for readjustment.  *See* §§ 6234(a) (BBA § 1101(c)(1), 129 Stat. at 634), 6226(a) (TEFRA § 402(a), 96 Stat. at 653); *see also Mammoth Cave*, 166 T.C., slip op. at 10.  The replacement of the FPAA with the FPA does not affect the burden of proof.  Accordingly, the adjustments in the FPA are presumed correct, and petitioner bears the burden of proving them erroneous.

Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed.  *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).  The Commissioner bears the burden of proof with respect to any new matter.  Rule 142(a)(1).

Petitioner does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.  Respondent bears the burden of proof for whether petitioner's allocation of its claimed noncash charitable contribution deductions was proper because respondent affirmatively raised this issue in his Answer.

Petitioner offered the prior testimony of Jeff McCormick, former vice president of finance for construction of Vulcan, in *Ranch Springs, LLC v. Commissioner*, 164 T.C. 93 (2025), as Exhibit 1000-P, his prior testimony in *Desoto Holdings LLC v. Commissioner*, No. 13013-20 (T.C. filed Nov. 9, 2020), as Exhibit 1001-P, and his affidavit in support of its position regarding the before value of the Property as Exhibit 1002-P.  It contends that Mr. McCormick's prior testimony and his affidavit should suffice as his testimony.  In his affidavit, Mr. McCormick explained that he is the caregiver for his wife.  Petitioner did not issue a subpoena for Mr. McCormick to testify.  Additionally, Mr. McCormick had the opportunity to testify remotely via Zoom.  Since the requirements of unavailability were not met under Rule 804(a) of the Federal Rules of Evidence, the prior testimony remains inadmissible

hearsay. Accordingly Exhibits 1000-P, 1001-P, and 1002-P are not admitted.

## II.    *Amount of the Deduction*

### A.    *Deductibility*

Section 170(a)(1) allows a deduction for any charitable contribution made during the tax year. Generally, no deduction is allowed for a contribution of less than a donor's entire interest in a property. § 170(f)(3)(A). Section 170(f)(3)(B)(iii) makes an exception to this general rule for a contribution of a partial interest in property that constitutes a "qualified conservation contribution." A "qualified conservation contribution" is defined as a contribution made (1) of a qualified real property interest, (2) to a qualified organization, (3) exclusively for conservation purposes. § 170(h)(1).

### B.    *General Valuation Principles*

If the taxpayer makes a charitable contribution other than money, the eligible deduction is generally equal to the fair market value of the property at the time of the donation. *See* Treas. Reg. § 1.170A-1(a), (c)(1). The regulations define fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). The value of property on a given date is a question of fact to be resolved on the basis of the entire record. *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

To support their positions regarding valuation, the parties retained experts. We assess an expert's opinion in the light of the expert's qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by an expert's opinion that we find contrary to our judgment, and we can accept an expert's opinion in its entirety or accept aspects of the expert's testimony that we find reliable. *Ranch Springs*, 164 T.C. at 128 (first citing *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); and then citing *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011)); *Parker*, 86 T.C. at 561. We may determine fair market value on the basis of our own examination

of the evidence in the record. *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

An established market does not exist typically for conservation easements. *See Symington v. Commissioner*, 87 T.C. 892, 895 (1986). Courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i). Under the before and after approach, the value of the easement is deemed equal to the fair market value of the real estate before the easement was granted minus the fair market value of the real estate as encumbered by the easement. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1368–69 (11th Cir. 2021); Treas. Reg. § 1.170A-14(h)(3)(i). Experts for both parties used the before and after valuation approach to value the easement.

In determining the fair market value of an easement we need to take into account the highest and best use of the property on the valuation date. *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3). A property's highest and best use is the most profitable, legally permissible use for which the property is adaptable and needed, or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington*, 87 T.C. at 897. A use that is higher than the current use "requires both 'closeness in time' and 'reasonable probability.'" *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985). Taking into account the highest and best use does "not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value." *Boltar*, 136 T.C. at 336.

C.    *Before Value of the Property*

1.    *Valuation Approaches*

Courts often consider one or more of three approaches to determine the fair market value of real property: (1) the market approach, also known as the comparable property sales approach, (2) the income approach, and (3) a cost or asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006).

For vacant, unimproved property, the comparable property sales approach is "generally the most reliable method of valuation." *Estate of*

*Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987) (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). The comparable property sales method determines fair market value by considering the sale prices of similar properties sold in arm's-length transactions close in time to the valuation date. *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *36. Because no two properties are identical, the appraiser must adjust the sale prices of the comparable properties, to account for differences between them, and the sales terms. *Id.*

The income method determines a property's fair market value by discounting to present value the expected future income from the property. *See, e.g., Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 327 (2013). Income-based methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable. *Ranch Springs*, 164 T.C. at 135 (citing *Chapman Glen Ltd.*, 140 T.C. at 327); *see also Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *33; *Savannah Shoals*, T.C. Memo. 2024-35, at *36.

The cost or asset-based approach is based on the principle of substitution. It "derives the value of a property by estimating the reproduction or replacement cost of the improvements, deducting therefrom the estimated depreciation, and then adding the market value of the land." *Talkington v. Commissioner*, T.C. Memo. 1998-412, slip op. at 22. Neither party argued that method was appropriate.

The parties' valuation experts used different approaches to determine the before value of the Property. Respondent's expert Mr. Ball used the comparable property sales approach. Petitioner's expert Mr. Catlett used the income method known as the owner-operator method. Mr. Catlett's valuation of the Property relied on the mineral valuation conducted by petitioner's expert Mr. Gold, who also used the income method to estimate the value of the Property's mineral reserves. Both the comparable property sales approach and the income method seek to determine the fair market value of a property on the basis of its highest and best use.

2.      *Highest and Best Use*

A property's highest and best use must be reasonably probable and result in the property's highest value. *See Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 331 (2012), *supplementing* 131

T.C. 112 (2008), *aff'd in part, vacated and remanded in part*, 755 F.3d 236 (5th Cir. 2014). To be a property's highest and best use, a proposed use must be (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. *Ranch Springs*, 164 T.C. at 136. Petitioner contends that the Property's highest and best use is as a limestone quarry, while respondent contends its highest and best use is recreational with all future development rights and mineral rights.

A property's current use is presumed to be its highest and best use absent proof to the contrary because property owners have an economic incentive to put their land to its most productive use. *Id.* OSI drilled on the Property during the due diligence period to confirm the presence of limestone, but as of December 27, 2018, the Property had been used only for recreational purposes. The Property's current use at the time of the contribution was therefore recreational.

The highest and best use factor "is an element in the determination of fair market value." *Boltar*, 136 T.C. at 336. But it is only one element. Highest and best use does not supersede or eliminate the most important prerequisite in determining fair market value, namely, that "a hypothetical willing buyer would purchase the subject property for the indicated value." *Id.*; *see Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at *41, *aff'd*, 158 F.4th 715 (6th Cir. 2025); Treas. Reg. § 1.170A-1(c)(2).

Where the parties propose different uses, we consider whether "'there is too high a chance that the property will not achieve the proposed use in the near future' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 1000 (11th Cir. 2016), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2014-79). We have applied this principle in the mining context on several occasions:

> Where the asserted highest and best use of property is the extraction of minerals, the presence of the mineral in a commercially exploitable amount and the existence of a market "that would justify its extraction in the reasonably foreseeable future" must be shown. *United States v. 69.1 Acres of Land*, [942 F.2d 290, 292 (4th Cir. 1991)]. "There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." *United States v.*

*Whitehurst*, 337 F.2d 765, 771–772 (4th Cir. 1964); *see also United States v. 494.10 Acres of Land*, 592 F.2d 1130, 1132 (10th Cir. 1979) (stating that "if the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative").

*J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at \*41–42 (quoting *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 2012 WL 371809, at \*8, *aff'd*, 744 F.3d 648 (10th Cir. 2014)); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*35.

Both Mr. Ball and Mr. Catlett began their highest and best use analyses by considering whether the potential use of the Property was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. Mr. Ball determined that the highest and best use of the Property before the grant of the conservation easement was recreational with all future development rights and mineral rights. Mr. Catlett determined that the highest and best use of the Property before the grant of the conservation easement was to develop it into a commercial limestone quarry.

a. *Limestone on Property*

OSI hired S&ME to drill two bore holes on the Property. S&ME conducted several tests on the material extracted from those two bore holes to determine its adequacy for use as construction aggregate and then completed a report. According to the S&ME Report, "shale lenses were extracted" from the material before the remaining material was crushed into a composite sample and tested. The S&ME Report does not indicate how much shale was extracted from each sample before crushing. The presence of shale is detrimental to the quality of limestone, and ALDOT allows a maximum of only 2% composition of shale in coarse aggregate that is used in asphalt and cement mixes. Respondent's expert geologists Mr. Partlow and Mr. Taylor both identified this missing information as an error that compromised the reliability of the testing because it was unclear what portions of the materials meet the ALDOT standards.

Mr. Partlow and Mr. Taylor identified significant issues with only two core samples being taken on the Property. Mr. Partlow opined that two core samples were inadequate to estimate the Property's limestone reserves because the Property contains multiple rock formations of varying quality according to geologic maps. He recommended intervals

of every 15 acres to adequately estimate the Property's limestone reserves. The two core samples were taken with the equivalent of one core hole for every 141 acres.

Mr. Taylor also concluded that the two core samples taken were not sufficient to adequately define or characterize the limestone reserves on the Property. He concluded that the results represented exploration results at best, not an indication of a mineral resource, and that the exploration was not sufficient to support a reasonable economic analysis of the Property consistent with industry standards. He further concluded that "the available geologic data, due to its limitations, should not be used in an economic analysis to determine financial feasibility."

We conclude that petitioner has not met its burden to show "the presence of the mineral in a commercially exploitable amount . . . 'that would justify its extraction in the reasonably foreseeable future.'" *See J L Mins.*, T.C. Memo. 2024-93, at \*41–42 (quoting *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*8).

### b. *Financial Feasibility and Existence of a Market*

Even if the Court were to find petitioner had proven the presence of limestone in a commercially exploitable amount, petitioner's proposed highest and best use fails for (1) lack of support for the existence of a market, and (2) failure to prove a mine's financial feasibility.

Respondent concedes that a limestone quarry would likely have been legally possible and that mining might have been physically possible on the Property after extensive site work, notwithstanding the doubts already discussed about the limestone on the Property. Respondent contends, however, that petitioner has not demonstrated that operating a limestone quarry on the Property would be financially feasible or reasonably likely to occur in the near future. We agree with respondent.

Mr. Catlett's highest and best use determination relied on the valuation of the mineral resource on the Property in the Gold report to conclude that mining was a financially feasible use. Respondent's expert Mr. Taylor's report pointed to a lack of detail within the mine plan developed by Mr. Gold that suggests missing costs. Mr. Taylor concluded that "[t]here appears to be missing equipment which translates to missing capital and operating expenses," and he determined that primary infrastructure on the Property such as haul

roads do not appear to have adequate design. He further concluded that "the net present value is likely overstated" in the Gold report.

Additionally, Mr. Taylor further criticized Mr. Gold's market assessment because he overestimated the market share that a hypothetical mine on the Property would be able to achieve, and he said that the market share assumed by Mr. Gold "is not supported by the available data." Mr. Gold projected that a hypothetical mine on the Property would achieve and maintain a 15% market share after ten years of operation. Mr. Taylor noted this volume of market share was achieved only by mines located much closer to the Huntsville metropolitan area. None of the market data petitioner provided supports the claim that a mine on the Property would achieve this market share given the mine's relative distance from Huntsville.

Mr. Catlett's analysis also relied upon the report of Mr. Fishkind, who calculated the Property's market supply and the demand for limestone aggregate. Respondent's expert Mr. Partlow agreed with petitioner's experts Mr. Gold and Mr. Fishkind that aggregates like limestone are generally produced close to where they are consumed because transportation costs play a large role in the delivered price of aggregates. In his report Mr. Fishkind purported to calculate the net demand for limestone in the Property's primary market by applying this principle.

Mr. Fishkind concluded there was a "volume of demand that the hypothetical mine at the Property has a competitive advantage to serve because of its favorable location in the Relevant Market compared to its competitors" of 3,976,668 tons that he termed net demand. The Fishkind report states that a hypothetical mine on the Property would have a competitive advantage in its "Relevant Market," which it defines as being within a 25-mile radius of the Property.

Mr. Fishkind's analysis was flawed. Despite the fact that the 14 competing quarries he identified produced more limestone than he estimated that the Relevant Market demanded, he disregarded over 5,100,000 short tons produced in 2018 to conclude there was net demand for nearly 4,000,000 additional short tons. Respondent's expert Mr. Ball concluded that "there are several existing quarries that are much better located to serve the growing parts of Madison County." Petitioner's expert Mr. Gold indicated from his site visit that the Vulcan Huntsville quarry believed in 2024 that it was able to keep up with the demand for limestone in Huntsville. The fact that we do not find Mr. Fishkind's

supply and demand analysis reliable further calls into question the reliability of Mr. Catlett's report.

Additionally, we are not convinced that it was reasonably probable to raise the additional capital required for the development of the Property as a mine. The emails that 1908 Capital sent to investors warned that "substantial additional investment would be required to undertake a mining operation" and represented the conservation easement option as advantageous relative to the development option. There is no credible evidence that the syndicators of the partnership interests or the purchasers of the partnership interests contemplated development of the Property as a mine as a legitimate option, casting further doubt that the market had an appetite for such investment. The lack of reasonable probability that a mine would be funded on the Property does not meet the test that the highest and best use is mining. *See Hilborn*, 85 T.C. at 689.

c.  *Mr. Ball's Highest and Best Use Analysis*

Respondent's expert Mr. Ball considered three primary possible uses for the Property: recreational, residential subdivision development, and mining. He visited the Property, drove around the Property's neighborhood, and spoke with market participants in the area. He determined subdivision development was not the Property's highest and best use given the topographical characteristics of the site, the availability of superior sites for such use, and the lack of existing infrastructure to support a subdivision.

On the basis of his investigation, Mr. Ball also concluded that mining was not the Property's highest and best use. He made this determination because the Property is in an isolated and rural neighborhood, there are existing quarries closer to where growth is occurring in the Huntsville MSA, and the market participants he spoke with confirmed there was no known demand for a quarry in the Property's area.

d.  *Highest and Best Use Conclusion*

The Property's current use at the time of the contribution was recreational, and we presume a property's highest and best use to be its current use. *Ranch Springs*, 164 T.C. at 136 (first citing *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); and then citing *Mountanos v. Commissioner*, T.C. Memo. 2013-138, at *7, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016)). Petitioner failed

to demonstrate "closeness in time" or "reasonable probability" that the Property would be used as a limestone mine. *Hilborn*, 85 T.C. at 689. Mr. Ball investigated the area and gave consideration to the legal, physical, and financial factors to determine that the Property's highest and best use was its current use, "recreational with all future development rights and mineral rights." We agree.

### 3. *Comparable Property Sales Approach*

Consistent with his determination that the highest and best use of the Property was recreational, Mr. Ball searched for sales of comparable recreational properties in Madison County, as well as neighboring Marshall and Jackson Counties. The comparable property sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24), *supplemented by* T.C. Memo. 2024-73.

Mr. Ball conducted an initial search in Madison, Marshall, and Jackson Counties for all sales of land involving properties of at least 40 acres between December 2014 and December 2019. This initial search resulted in 51 sales of property in Madison County, 41 sales in Marshall County, and 39 sales in Jackson County. The 51 sales that met the criteria in Madison County had a mean purchase price of $7,317 per acre. The 41 sales that met the criteria in Marshall County had a mean purchase price of $2,863 per acre. The 39 sales that met the criteria in Jackson County had a mean purchase price of $2,504 per acre. He further narrowed his search to sales of properties of at least 80 acres in those counties between 2014 and 2018, which resulted in a list of 43 properties.

Mr. Ball next evaluated the details of the 43 sales of properties to determine those most comparable to the Property. He considered the geographic location, access, topography, and other physical characteristics and identified five sales of properties that he determined were most comparable.

Mr. Ball made qualitative adjustments to the sale prices of the five comparable properties to account for differences in physical characteristics and sale dates. Petitioner did not object to the

comparable property sales that Mr. Ball selected or the price adjustments he made, except to argue that the properties did not have a highest and best use of mining. The five comparable properties Mr. Ball selected had adjusted prices between $3,589 and $3,903 per acre, for an average adjusted price of $3,766 per acre. On the basis of his analysis, Mr. Ball determined the before value of the Property to be $3,800 per acre, for a value of $1,440,000.

We find no flaws in Mr. Ball's approach, and we find his bottom line to be firmly supported, not only by the comparable property transactions he selected, but also by the sale of the partnership interests in petitioner in June 2018. The purchase of an interest in a partnership can be "reflective of the price that the market would pay for [a property], especially when the ownership interest was nearly 100% and the only asset held by the [p]artnership was the [property] itself." *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*56, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sep. 2, 2025); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1371 n.23; *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53, at \*61–62 (applying this concept to assign significant valuation weight to a 97% sale of partnership interests).

Petitioner's Initial Company Agreement executed on June 27, 2018, just before the purchase of DESE Properties' partnership interest by Natural Aggregates shows two contributions were made to petitioner at that time: (1) the Property (by DESE Properties) and (2) $4,100 in cash (by Dr. Kirkpatrick). The Property was valued at $816,000 on the real estate sales validation form that Mr. Kaynard sent to Dr. Kirkpatrick on June 25, 2018. Natural Aggregates paid DESE Properties $816,000 for its 98% partnership interest.[6] The settlement statement that was executed in conjunction with Natural Aggregates'

---

[6] Respondent contends that the June 2018 transaction did not constitute the purchase of a 98% partnership interest in petitioner for $816,000, as we have found, but rather constituted a direct purchase of the Property itself by petitioner at that price. Respondent argues that petitioner's holding period therefore restarted in June 2018 and cites section 170(e)(1)(A) to argue that the value of the charitable contribution above $816,000 must be reduced because it was not long-term capital gain when the contribution was made in December 2018. In support of his theory, respondent contends alternatively (1) that the form-versus-substance doctrine should be applied to recharacterize the transaction or (2) that the partnership was not valid because Dr. Kirkpatrick, a 0.5% partner, was a mere "accommodation party." Respondent has not supplied sufficient factual basis to support either contention. We accordingly reject his argument that the allowable charitable contribution deduction would be limited to $816,000 under section 170(e)(1)(A).

purchase of DESE Properties' partnership interest reflects total consideration of $820,100, of which $816,000 was for the 98% partnership interest and $4,100 was paid directly to Dr. Kirkpatrick. Grossing up Natural Aggregates' ownership percentage to 100%, the Property was thus valued at roughly $832,653, or $2,204 per acre. *See Oconee Landing*, T.C. Memo. 2024-25, at *71–72 (citing *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368).

We have previously stated that "the degree to which the purchase of an interest in a partnership whose sole asset is a piece of property reflects the fair market value of the property varies by situation." *Lake Jordan Holdings, LLC v. Commissioner*, T.C. Memo. 2025-123, at *40 n.18. The record reflects that the sale of the partnership interests in June 2018 was an arm's-length transaction. DESE Properties had an understanding of the market as evidenced by the fact it purchased or sold 18 properties between 2016 and 2018, 8 of which were in Madison County. The June 2018 transaction was not one "where the value of the partnership interest is derived from a capital raise that contemplates paying for extensive services in addition to funding the acquisition of the interest in the entity holding the relevant property." *Id.*; *see also Hancock Cnty. Land Acquisitions, LLC v. Commissioner*, T.C. Memo. 2026-28, at *36 n.9. The June 2018 purchase of the partnership interests is probative of the Property's fair market value.

Natural Aggregates' purchase of DESE Properties' partnership interests supports Mr. Ball's determination that the Property was worth (at most) $1,440,000. We therefore adopt Mr. Ball's valuation of $1,440,000 as the before value of the Property.

### 4. *Income Approach*

Mr. Catlett dismissed the comparable property sales approach because he claimed to find no comparable properties with a highest and best use of mining. He employed the income method to determine the before value of the Property. The income method determines fair market value by discounting to present value the expected future income from the property. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327.

Two versions of the income approach, both employing a DCF methodology, have been used in SCE cases involving land with mining as the alleged highest and best use. The first is the "owner-operator method." Under this approach, the pre-easement value of the land is determined by discounting to present value the cashflows an owner-

operator supposedly could derive by constructing and operating a mining business on the property. *See N. Donald LA Prop., LLC v. Commissioner*, T.C. Memo. 2026-19, at \*54–55. The second is the "royalty income method." This method posits that the landowner would lease the land to a mine operator, then determines the land's pre-easement value by calculating the discounted present value of the royalty payments the landowner might receive from the operator. *Id.* Mr. Catlett used the first of these methods—the owner-operator method—in his valuation.

Mr. Catlett assumed the highest and best use of the Property was as a limestone quarry. Petitioner failed to establish that mining was financially feasible or reasonably likely to be financially feasible in the near future. Mr. Catlett's before value of the Property of $34,540,000 would fail on this ground alone. Previously, we have held that the use of a DCF method is erroneous where it equates the value of raw land with the net present value of a hypothetical limestone business conducted on the land. *See Ranch Springs*, 164 T.C. at 151–53; *Beaverdam Creek*, T.C. Memo, 2025-53, at \*36. Even if we were to conclude that the highest and best use of the Property was as a limestone mine, Mr. Catlett's before value of $34,540,000 would fail because it makes the same error.

Mr. Catlett's analysis is not a novel approach. This Court has addressed and rejected repeatedly the use of the income method to value mineral properties with no income-producing history in conservation easement cases. *Ranch Springs*, 164 T.C. at 151; *Harman Road Prop., LLC v. Commissioner*, T.C. Memo. 2026-23, at \*42; *N. Donald LA Prop.*, T.C. Memo. 2026-19, at \*59; *Jackson Stone S., LLC v. Commissioner*, T.C. Memo. 2025-96, at \*104–05; *Green Valley Invs., LLC v. Commissioner*, T.C. Memo. 2025-15, at \*31; *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111, at \*41, *aff'd*, Nos. 25-10744, et al., 2026 WL 822261 (11th Cir. Mar. 25, 2026); *J L Mins.*, T.C. Memo. 2024-93, at \*64–65; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*43–44.

We see no difference in Mr. Catlett's use of the owner-operator method here. Petitioner contends that Mr. Catlett's methodology valued the underlying land rather than a hypothetical business operating on the Property. But it is clear from Mr. Catlett's report that he conducted an evaluation of the projected income from a hypothetical mining business on the property using speculative inputs and then attributed that discounted value of the hypothetical mining business to the value of the Property itself.

Income capitalization methods are most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates because "[a] historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *43–44 (citing *Whitehouse Hotel*, 139 T.C. at 325 (observing that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")); *see also J L Mins.*, T.C. Memo. 2024-93, at *61. There is no such historical record for the Property.

A valuation analysis based on a DCF can be highly speculative because "[r]elatively minor changes in only a few of [an expert's] assumptions [can] have large bottom-line effects." *Ranch Springs*, 164 T.C. at 157 (quoting *Whitehouse Hotel*, 139 T.C. at 323). Mr. Catlett's report's reliance upon the reports of Mr. Fishkind and Mr. Gold undermined its reliability as to both highest and best use and value. We have already discussed the issues with both missing costs and unrealistic market share assumptions made in Mr. Gold's report. Mr. Ball also explained in his rebuttal report why the demand analysis relied upon by Mr. Catlett was flawed. He explained that the Property was in the southeastern portion of the county, where the fewest numbers of building permits had been requested, and there were existing quarries better located to serve the growing parts of the county.

Mr. Catlett assumed a hypothetical quarry on the Property would sell more limestone each year that it continued to be in operation. Mr. Taylor included data in his report of the production of limestone from quarries within 25 miles of the city of Huntsville. The data show that from 2006–18, almost no quarries reported a year-over-year increase in production. This leveling off, combined with the fact that other quarries were better located to serve growing demand in the Huntsville MSA, leads us to conclude that Mr. Catlett's report does not sufficiently consider the risks with operating a mine; it is a "rosy projection[]" that contemplates only success. *See J L Mins.*, T.C. Memo. 2024-93, at *63–64.

In addition to detailing the issues with Mr. Catlett's inputs, Mr. Ball in his rebuttal report identified two additional sales of comparable properties that occurred approximately three and a half years after the Property's contribution. The two additional properties were similar to the Property; one directly adjoins the Property, while the other is less than half of a mile to the southeast. The two additional properties sold

for $4,000 per acre and $3,289 per acre, respectively. Mr. Ball's before value determination of $3,800 per acre falls within this range, while Mr. Catlett's before value of $91,439 per acre is approximately 24 times higher. Mr. Ball further explained that if the value stated in Mr. Catlett's report were correct, then that value would have been reflected in the prices paid for adjoining and nearby properties that occurred after the date of the Property's valuation. We consider these subsequent sales relevant to the extent that they make Mr. Ball's valuation more likely and Mr. Catlett's valuation less likely. *See Paul-Adams Quarry Tr., LLC v. Commissioner*, T.C. Memo. 2025-112, at *83 n.54.

Mr. Catlett's use of the income method to purportedly value the Property was based on speculative inputs of dubious reliability. We do not need to belabor the flaws of the income method as applied here. A knowledgeable buyer would simply not pay the entire projected value of a business for one of the assets needed to conduct the business. *See Ranch Springs*, 164 T.C. at 153; *N. Donald LA Prop.*, T.C. Memo. 2026-19, at *55.

The income method petitioner relied on was not reliable in providing an estimate of the Property's value. For these reasons the before value of the Property is $1,440,000, as determined by Mr. Ball.

D.  *After Value of the Property*

The parties stipulated that the value of the Property after it was encumbered by the conservation easement is $640,000.

E.  *Value of the Easement*

We conclude that the fair market value of the Property at the time of the contribution of the easement was $1,440,000. Subtracting the parties' stipulated after value of $640,000 from the before value, the value of the conservation easement on the Property is $800,000.

III.  *Allocation of Petitioner's Charitable Contribution Deductions*

A.  *Background Law*

Under section 702 the partners shall each separately take into account their distributive shares of the partnership's income, gain, loss, deductions, and credits in determining their income tax. A partner's distributive share of income, gain, loss, deduction, or credit is generally determined by the partnership agreement. § 704(a). Where the

partnership agreement does not specify how to determine each partner's distributive share, or an allocation under a partnership agreement does not have substantial economic effect, the partners' distributive shares are determined in accordance with the partners' interests in the partnership. § 704(b); *see also* Treas. Reg. § 1.706-4(a)(2) ("In all cases, all partnership items for each taxable year must be allocated among the partners . . . ."). A partner must separately take into account his distributive share of the partnership's charitable contributions. § 702(a)(4).

Section 706 provides additional rules for determining the allocation of partnership items when there is a transfer of a partnership interest in a partnership's taxable year. *Marriott v. Commissioner*, 73 T.C. 1129, 1139 (1980).[7] Section 706 specifically applies to variations. § 706(d)(1); Treas. Reg. § 1.706-4(a)(1). A variation occurs when a

> partner's interest in a partnership varies during the taxable year as a result of the disposition of a partial or entire interest in a partnership . . . , or with respect to a partner whose interest in a partnership is reduced . . . , including by the entry of a new partner (collectively, a "variation").

Treas. Reg. § 1.706-4(a)(1). If a partner disposes of his entire interest in a partnership within a taxable year or a new partner enters the partnership, each partner is required to report his distributive shares of partnership items for the period in which he was a partner for the year. *Marriott*, 73 T.C. at 1138–40. The transferor of a partnership interest must report his share of pre-transfer partnership profits and losses, and the transferee must report his share of post-transfer partnership profits and losses. *Id.*; *Moore*, 70 T.C. at 1032. If a partner disposes of his entire interest, the taxable year closes only with respect to the partner who disposed of his entire interest. § 706(c)(2); Treas. Reg. § 1.706-1(c)(2).

Where a partner disposes of less than his entire interest in the partnership during a taxable year, the taxable year of the partnership does not close and the partner's distributive shares of income, gain, loss,

---

[7] The Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 72(a), 98 Stat. 494, 589, amended section 706 and moved the varying interest rule from section 706(c)(2)(B) to section 706(d)(1). *Marriott*, 73 T.C. 1129, *Moore v. Commissioner*, 70 T.C. 1024 (1978), and *Richardson v. Commissioner*, 76 T.C. 512 (1981), *aff'd*, 693 F.2d 1189 (5th Cir. 1982), all reference section 706(c)(2)(B) varying interests from before this modification, but the modification does not affect the principles discussed.

deduction, and credit are determined according to the "varying interest rule." § 706(c)(2)(B); Treas. Reg. § 1.706-4(a); *see also Richardson*, 76 T.C. at 521–25; *Savannah Shoals*, T.C. Memo. 2024-35, at \*20 n.21 ("This procedure is known as the varying interest rule . . . ."). Specifically, section 706(d)(1) provides:

> [I]f during any taxable year of the partnership there is a change in any partner's interest in the partnership, each partner's distributive share of any item of income, gain, loss, deduction, or credit of the partnership for such taxable year shall be determined by the use of any method prescribed by the Secretary by regulations which takes into account the varying interests of the partners in the partnership during such taxable year.

Treasury Regulation § 1.706-4(a)(3) outlines a ten-step process for determining partners' distributive shares where there are variations in the partners' interests in the partnership.

### B. *Analysis*

#### 1. *Petitioner's State Law Argument*

Petitioner argues that under Alabama law its company agreements, not the respective MIPSAs, should determine when 1908 Capital PG and Piton Group became members. Petitioner further argues Alabama law provides that an LLC's company agreement governs relationships among the members as members and between the members and the LLC. *See* Ala. Code § 10A-5A-1.08(a)(1) (1975). Petitioner however fails to point to any authority that supports its claim that its company agreements govern the contractual relationship between a member of the LLC and a nonmember.

Each iteration of petitioner's company agreement provided specific rules that members were required to follow to transfer their membership interests. Regardless of whether the sellers followed the prescribed rules, the sale of a membership interest in an LLC and the admission of a new member to an LLC each inherently involve dealing with entities that are nonmembers. Because 1908 Capital PG and Piton Group were not members until their respective purchases of membership interests in petitioner, the existing respective agreements do not govern their contractual relationship.

Sellers of membership interests in petitioner, including TOFT, Province, and OS LLC with respect to the 1908 MIPSA, and then 1908 Capital PG with respect to the Piton Group MIPSA, chose to use written agreements (the MIPSAs) to establish the terms and conditions of their respective sales of membership interests to nonmember entities. We interpret contract provisions according to state law. *See Belk v. Commissioner*, 140 T.C. 1, 13 n.21 (2013), *supplemented by* T.C. Memo. 2013-154, *aff'd*, 774 F.3d 221 (4th Cir. 2014). In Alabama judicial review of an unambiguous contract is limited to the four corners of the document. *See Lafayette Land Acquisitions II, LLC v. Walls*, 385 So. 3d 519, 522–23 (Ala. 2023). Petitioner does not argue that the MIPSAs are ambiguous or dispute any relevant portion of them. Because the issue concerns petitioner's dealings with third parties, and the MIPSAs are not ambiguous, the terms of the respective MIPSAs govern when 1908 Capital PG, and subsequently Piton Group, became members of petitioner.

The parties chose to use MIPSAs to transfer their partnership interests. The MIPSAs set out requirements that needed to be met before the transfers of the partnership interests, as well as additional provisions. The MIPSAs therefore control when 1908 Capital PG and Piton Group became members of petitioner for federal tax purposes. *See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974).

2. *Petitioner's Variations*

Petitioner had four variations in its 2018 tax year. Petitioner was formed under state law in 2017 but did not purport to be a partnership until June 27, 2018, when Dr. Kirkpatrick executed the Initial Company Agreement. That agreement recognized DESE Properties and Dr. Kirkpatrick as petitioner's initial members. The first variation occurred when DESE Properties sold a 98% interest in petitioner to Natural Aggregates on June 29, 2018. The second variation occurred when Natural Aggregates distributed its 98% interest in petitioner to TOFT, Province, and OS LLC on December 3, 2018. During the period following petitioner's second variation, petitioner's members included TOFT, Province, OS LLC, DESE Properties, and Dr. Kirkpatrick.

With respect to Petitioner's Second Amended Company Agreement, and Petitioner's Third Amended Company Agreement, Mr. Brown's email to Mr. Comerford on January 3, 2019, implies that the documents had not been executed by that date and that further

discussions about dating the agreements were needed. It cannot be genuinely disputed that the documents attached thereto, including the MIPSAs, were executed on or after January 3, 2019, when the email was sent. Even when assuming that the backdating of the company agreements memorialized prior agreements between the parties, the company agreements do not control when 1908 Capital PG and Piton Group became members of petitioner for federal tax purposes because of the provisions in the MIPSAs. The 1908 MIPSA, which had a stated effective date of December 19, 2018, stated that the rights and obligations of the parties would not be affected by "any amendment or modification of or addition or supplement to the Company Agreement."

The 1908 MIPSA required 1908 Capital PG to satisfy two requirements to exercise the 1908 purchase option: (1) deliver the purchase price to the sellers, and (2) execute Petitioner's Second Amended Company Agreement.

The 1908 MIPSA stated that the documents necessary to transfer the interests should be executed upon receipt of the purchase price. Wire receipts indicate that 1908 Capital PG's first payment to OSI regarding the 1908 MIPSA occurred on December 27, 2018, at 3:26 p.m. central time. Additionally, 1908 Capital PG's parent company reported on its 2018 return that its interest in petitioner was acquired on December 27, 2018. *See Mendes v. Commissioner*, 121 T.C. 308, 312 (2003) (finding that statements on tax returns may generally be treated as admissions by that taxpayer). The earliest that 1908 Capital PG could have become a member of petitioner was on December 27, 2018, at 3:26 p.m. central time. The earliest that petitioner's third variation could have occurred was at that time. During the segment following petitioner's third variation, petitioner's members were 1908 Capital PG, DESE Properties, and Dr. Kirkpatrick.

For similar reasons, and because 1908 Capital PG could not transfer a membership interest it did not have, the earliest time at which Piton Group could have become a member of petitioner is December 28, 2018, at 3:23 p.m. central time. 1908 Capital PG's purported transfer of the 97% membership interest in petitioner to Piton Group under the Piton Group MIPSA was "[s]ubject to the payment of the purchase price to [1908 Capital PG]." Receipts indicate that the first payment with respect to the Piton Group MIPSA was made on December 28, 2018, at 3:23 p.m. central time.

Further, it logically follows from our finding that 1908 Capital PG could not have become a member before December 27, 2018, that Piton Group could not have become a member before then. 1908 Capital PG did not own a membership interest in petitioner that it could legally transfer on December 26, 2018, when petitioner claims Piton Group became a member; Piton Group could not have become a member in petitioner until December 28, 2018, at 3:23 p.m. central time, and that is the earliest that petitioner's fourth variation could have occurred. After the fourth variation, and through the remainder of petitioner's 2018 calendar tax year, petitioner's members were Piton Group, DESE Properties, Dr. Kirkpatrick, and 1908 Capital PG.

### 3. *Application of the Varying Interest Rule*

Because there were variations with respect to petitioner's membership interests in 2018, the varying interest rule applies to determine the members' distributive shares for each respective period. There are two exceptions to the varying interest rule. Treas. Reg. § 1.706-4(b).

First, the varying interest rule is not applied to determine partners' distributive shares when the partnership's variations for the tax year include only permissible changes to allocations of the distributive shares of tax items among contemporaneous partners for an entire year or segment of a year. *Id.* subpara. (1). Second, variations in partnerships for which capital is not a material income-producing factor, or service partnerships, are not subject to the varying interest rule. *Id.* subpara. (2). Petitioner has not argued that either exception to the varying interest rule applies.

Since petitioner is not excepted from the varying interest rule, we must determine whether petitioner's noncash charitable contributions are extraordinary items subject to special allocation rules under Treasury Regulation § 1.706-4(e). Treas. Reg. § 1.706-4(a)(3)(ii). Extraordinary items include "[a]ny item from the disposition or abandonment (other than in the ordinary course of business) of a capital asset as defined in section 1221 (determined without the application of any other rules of law)." Treas. Reg. § 1.706-4(e)(2)(i).[8] The use of the broad-sweeping term "any" suggests that items arising from a partial

---

[8] Treasury Regulation § 1.706-4(e)(2) was amended in June 2024 to specifically include in the definition of extraordinary items qualified conservation contributions after December 29, 2022. T.D. 9999, 2024-30 I.R.B. 72, 119, *corrected by* T.D. 9999, 89 Fed. Reg. 70486 (Aug. 30, 2024).

disposition, such as a donation of a conservation easement, also qualify as extraordinary items.

A capital asset is

property held by the taxpayer (whether or not connected with his trade or business), but does not include . . . stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

§ 1221(a)(1). An inventory item is property held primarily for sale to customers in a trade or business. *See* § 751(d) (defining "inventory items" by reference to section 1221(a)(1)).

Whether a taxpayer holds property primarily for sale to customers in the ordinary course of its business rather than as an investment presents a question of fact. *Pritchett v. Commissioner*, 63 T.C. 149, 162 (1974). Because capital gains treatment "is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Boree v. Commissioner*, 837 F.3d 1093, 1100 (11th Cir. 2016) (quoting *Corn Prods. Refin. Co. v. Commissioner*, 350 U.S. 46, 52 (1955)), *aff'g in part, rev'g in part* T.C. Memo. 2014-85.

The Eleventh Circuit has explained that this determination involves three subsidiary inquiries: (1) whether the taxpayer was engaged in a trade or business; (2) whether the taxpayer held the property primarily for sale in that business; and (3) whether the sales contemplated by the taxpayer were "ordinary" in the course of that business. *Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984) (citing *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980)).[9]

---

[9] The Eleventh Circuit has identified several factors that may be relevant in these inquiries: (1) the nature and purpose of the property's acquisition and the duration of the taxpayer's ownership; (2) the extent of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for sale of the property; (6) the degree of supervision exercised by the taxpayer over any broker hired to sell the property; and (7) the time and effort the taxpayer habitually devoted to the sales activity. *Boree v. Commissioner*, 837 F.3d at

Petitioner was not engaged in a trade or business; its only purpose was to facilitate the SCE and the fee simple transactions. Petitioner's 2018 Form 1065 indicates that its principal business activity was investment, that the Property was its sole noncash asset, and that the property transactions described herein were petitioner's only business activity in that year. We take petitioner at its word with respect to its tax reporting. *See Mendes*, 121 T.C. at 312; *see also Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2023-82, at *11–15 (placing great weight on a real estate dealer's characterization of a property on its tax return), *supplementing* T.C. Memo. 2020-148, *aff'd*, No. 23-14039, 2025 WL 1603497 (11th Cir. June 6, 2025). Petitioner was not engaged in a trade or business, and therefore could not have held the Property for sale in a trade or business. Under these circumstances, it is evident that the Property was held for investment and is therefore a capital asset as defined in section 1221. Consequently, the conservation easement and fee simple donation with respect to the Property gave rise to extraordinary items under Treasury Regulation § 1.706-4(e)(2)(i).

Because they are extraordinary items, we do not need to proceed to the remaining steps in the ten-step process found in Treasury Regulation § 1.706-4(a)(3). The noncash charitable contributions must be allocated to the members "in proportion to their interests in the partnership item at the time of day on which the extraordinary item occurred, regardless of the method . . . and convention . . . otherwise used by the partnership." *Id.* para. (e)(1). Petitioner incurred the noncash charitable contributions on December 27, 2018, at 3:03 p.m. and 3:05 p.m. central time, when it recorded the deed of conservation easement and the warranty deed, respectively. Petitioner's third variation did not occur until December 27, 2018, at 3:26 p.m. central time at the earliest. At the time petitioner incurred the noncash charitable contribution deductions, petitioner's third variation had not yet occurred. Petitioner therefore had five members at the time of the charitable contribution: TOFT, Province, DESE Properties, Dr. Kirkpatrick, and OS LLC.

---

1100 (citing *United States v. Winthrop*, 417 F.2d 905, 909–10 (5th Cir. 1969)). Each case must be decided on the pertinent facts and circumstances. *Id.* (citing *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976) (en banc)). No factor or combination of factors is controlling, but the frequency and substantiality of sales is the "most important" of the factors. *Id.* (quoting *Biedenharn*, 526 F.2d at 415–16). It is unnecessary to make a finding with respect to each factor. *See id.* at 1105 ("We do not think that the factors are meant to be mechanically applied so as to disallow a court from viewing the evidence in its totality and drawing appropriate inferences from that evidence.").

C.     *Allocation*

Respondent has met his burden of proof on this issue.  Petitioner must allocate any allowable charitable contribution deductions accordingly to its members at the time of the contribution.  *See id.* Because neither 1908 Capital PG nor Piton Group was a member of petitioner at the time petitioner made the noncash charitable contributions, petitioner's allocation of any consequent deductions to those entities is improper as a matter of law.

IV.     *Penalty*

Respondent determined various alternative penalties including a substantial understatement penalty, a substantial valuation misstatement penalty, and a gross valuation misstatement penalty under section 6662(d), (e), and (h), respectively.  Only one accuracy-related penalty may be applied with respect to a given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b).  Treas. Reg. § 1.6662-2(c).

Because petitioner is a partnership subject to the BBA, any penalty with respect to an adjustment to a partnership-related item generally will be determined at the partnership level. § 6221(a). Under the BBA a partnership is liable for an imputed underpayment on any adjustment to a partnership-related item. § 6225. A penalty, whether an accuracy-related or a fraud penalty, is computed on the imputed underpayment as if the partnership were an individual and the imputed underpayment were an actual underpayment or understatement for the year. § 6233(a)(3). For purposes of determining whether a partnership satisfies the reasonable cause and good faith exception under section 6664(c), the partnership is treated as the taxpayer. Treas. Reg. § 301.6233(a)-1(c)(2)(iv)(D).

A.     *Gross Valuation Misstatement Penalty*

The Code imposes a 20% penalty for an underpayment of tax required to be shown on a return that is attributable to "[n]egligence or disregard of rules or regulations," "[a]ny substantial understatement of income tax," or "[a]ny substantial valuation misstatement."  § 6662(a) and (b)(1), (2), and (3).  A valuation misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount.  § 6662(e)(1)(A).  The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h).  A valuation misstatement

is "gross" if the value of property claimed on the return exceeds 200% of the correct amount.  § 6662(h)(2)(A)(i).

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]."  § 6664(c)(1).  The reasonable cause defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property.  *See* § 6664(c)(3).  The reasonable cause defense is not available where the overstatement is "gross."  *See* § 6664(c)(3).

Petitioner claimed a $41,635,000 noncash charitable contribution deduction for its donation of the easement.  We have determined that the value of the easement on the valuation date was only $800,000.  The claimed value of $41,635,000 exceeds the correct value by far more than 200%.  The valuation misstatement was therefore "gross."

Since the overstatement was "gross," the reasonable cause defense is not available.  *See* § 6664(c)(3); *see also Chandler v. Commissioner*, 142 T.C. 279, 293 (2014).

B.     *Constitutional Challenge to Section 6662 Penalty*

Petitioner disputes the constitutionality of the accuracy-related penalty under section 6662 in the light of the U.S. Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), arguing that the Seventh Amendment to the U.S. Constitution guarantees a right to trial by jury.  We concluded in *Silver Moss Properties, LLC v. Commissioner*, 165 T.C. 37, 41 (2025), that the tax matters partner was not entitled to a jury trial as to a statutory civil tax fraud penalty assessed against the taxpayer.  We further concluded in *Silver Moss*, 165 T.C. at 50–51, that the statutory civil tax fraud penalty fell within the public-rights exception to the Seventh Amendment's right to a jury trial.  In *Riddle Aggregates, LLC v. Commissioner*, No. 31104-21, 165 T.C., slip op. at 4–5 (Dec. 15, 2025), we concluded that the holding in *Silver Moss* applies to accuracy-related penalties.

In both *Silver Moss* and *Riddle Aggregates*, the partnerships were subject to the audit and litigation procedures of TEFRA.  *See Riddle Aggregates*, 165 T.C., slip op. at 2; *Silver Moss*, 165 T.C. at 37.  A jury trial is not available in district court for TEFRA partnership-level actions.  *Silver Moss*, 165 T.C. at 40.  The unavailability of jury trials in TEFRA partnership-level actions is the exception and not the rule.  *Id.* at 40 n.8.  When the BBA replaced TEFRA, this exception was

maintained. *See id.*; *see also* 28 U.S.C. § 2402. The BBA audit and litigation regime does not provide a right to a trial by jury in partnership-level proceedings. *See* §§ 6226(d), 6234; *see also* 28 U.S.C. § 2402.

In *Riddle Aggregates*, we concluded that the accuracy-related penalty under section 6662 falls squarely within the public rights exception. *Riddle Aggregates*, 165 T.C., slip op. at 8 (citing *Silver Moss*, 165 T.C. at 51). The section 6662 accuracy-related penalty applies to any portion of an underpayment of tax required to be shown on a return. § 6662(a). Section 6233(a)(3) provides that a penalty determined for the reviewed year "shall be determined at the partnership level as if such partnership had been an individual subject to tax under chapter 1 for the reviewed year and the imputed underpayment were an actual underpayment." For an adjustment year return, the partnership is liable for penalties determined "by treating the imputed underpayment as an underpayment of tax for purposes of part II of subchapter A of chapter 68." § 6233(b)(3). The section 6662 accuracy-related penalty is in part II of subchapter A of chapter 68. § 6662. Accordingly, the holding in *Riddle Aggregates* applies to BBA partnerships.

C. *Whether the Adequate Disclosure Exception Applies to the Substantial or Gross Valuation Misstatement Penalty*

Petitioner contends that the disclosure exception pursuant to section 6662(d)(2)(B) applies to any section 6662(a) penalty. According to Treasury Regulation § 1.6662-5(a), there is no disclosure exception to the penalty for a substantial or gross valuation misstatement. Petitioner argues that the no disclosure exception provided by the regulation is invalid.

Respondent disagrees with petitioner on the basis of two separate arguments. First, respondent argues that "[b]y the plain language of" section 6662, the adequate disclosure exception does not apply to gross and substantial valuation misstatement penalties. Second, respondent argues that even if his first argument is incorrect, no adequate disclosure relief can be granted because the underpayment resulted from a tax shelter. *See* § 6662(d)(2)(C). We agree with respondent's first argument and therefore, do not need to address the second argument.

1. *Analysis of Section 6662*

Statutory interpretation always begins with the statute's text. *Williams v. Taylor*, 529 U.S. 420, 431 (2000). "If the text is

unambiguous, the statute must be enforced in accordance to its plain meaning." *Frutiger v. Commissioner*, 162 T.C. 98, 103 (2024) (first citing *King v. Burwell*, 576 U.S. 473, 486 (2015); and then citing *Green v. Commissioner*, 707 F.2d 404, 405 (9th Cir. 1983), *rev'g* 78 T.C. 428 (1982)). "[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King*, 576 U.S. at 486 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Section 6662 is titled "Imposition of accuracy-related penalty on underpayments." In relevant part, section 6662(a) and (b) provides:

(a) Imposition of penalty.—If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of underpayment to which section applies.—This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

(1) Negligence or disregard of rules or regulations.

(2) Any substantial understatement of income tax.

(3) Any substantial valuation misstatement under chapter 1.

(4) Any substantial overstatement of pension liabilities.

(5) Any substantial estate or gift tax valuation understatement.

(6) Any disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law.

(7) Any undisclosed foreign financial asset understatement.

(8) Any inconsistent estate basis.

Subsections (c) through (g), (j), and (k) provide additional rules tied to specific penalties listed in section 6662(b), while subsections (h) and (i) modify some penalties if certain conditions are met. Three subsections

take center stage: (1) section 6662(d), which is pinned to the penalty for a substantial understatement of income tax; (2) section 6662(e), which is pinned to the penalty for substantial valuation misstatements; and (3) section 6662(h), which governs gross valuation misstatements.

Section 6662(d) is titled "Substantial understatement of income tax." In relevant part, section 6662(d) provides:

> (1) Substantial understatement.—
>> (A) In general.—For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—
>>> (i) 10 percent of the tax required to be shown on the return for the taxable year, or
>>> (ii) $ 5,000.
>
> . . . .
>
> (2) Understatement.—
>> (A) In general.—For purposes of paragraph (1), the term "understatement" means the excess of—
>>> (i) the amount of the tax required to be shown on the return for the taxable year, over
>>> (ii) the amount of the tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)).
>
> . . . .
>
>> (B) Reduction for understatement due to position of taxpayer or disclosed item.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—
>>> (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or
>>> (ii) any item if—
>>>> (I) the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, and

>> (II) there is a reasonable basis for the tax treatment of such item by the taxpayer.
>
> For purposes of clause (ii)(II), in no event shall a corporation be treated as having a reasonable basis for its tax treatment of an item attributable to a multiple-party financing transaction if such treatment does not clearly reflect the income of the corporation.

Section 6662(d)(2)(C) provides that section 6662(d)(2)(B) "shall not apply to any item attributable to a tax shelter" and defines the term "tax shelter."

Section 6662(e) is titled "Substantial valuation misstatement under chapter 1." In relevant part, section 6662(e) provides:

> (1) In general.—For purposes of this section, there is a substantial valuation misstatement under chapter 1 if—
>> (A) the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be) . . .
>> . . . .
> (2) Limitation.—No penalty shall be imposed by reason of subsection (b)(3) unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $5,000 ($10,000 in the case of a corporation other than an S corporation or a personal holding company . . . ).

Section 6662(h) is titled "Increase in penalty in case of gross valuation misstatements." In relevant part, section 6662(h) provides:

> (1) In general.—To the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation misstatements, subsection (a) shall be applied with respect to such portion by substituting "40 percent" for "20 percent".
> (2) Gross valuation misstatements.—The term "gross valuation misstatements" means—

(A) any substantial valuation misstatement under chapter 1 as determined under subsection (e) by substituting—

(i) in paragraph (1)(A), "200 percent" for "150 percent" . . . .

2. *Section 6662: Discussion*

Section 6662(a) is a generally applicable provision through which all accuracy-related penalties are imposed on underpayments of tax. Section 6662(b) lists the penalizable causes of an underpayment (noting that there may be "1 or more"), functionally providing a list of penalties. Subsections (c) through (g), (j), and (k) set forth provisions pertaining to the individual penalty (listed in section 6662(b)) that each subsection is titled after. Subsections 6662(h) and (i) set forth provisions modifying some penalties listed in section 6662(b) if certain conditions are met.

A plain reading of section 6662 reflects that provisions in subsections (c) through (g), (j), and (k) do not apply to all section 6662 penalties. Rather, those provisions apply only to the specific penalty that the subsection in which they are found pertains to. The adequate disclosure exception is found in section 6662(d)(2)(B)(ii), and no text extends that exception to any other section 6662 penalty. The adequate disclosure exception therefore applies only to the substantial understatement penalty under section 6662(d).

Petitioner's argument that the adequate disclosure exception applies not only with respect to the substantial understatement penalty, *see* § 6662(b)(2), (d), but may also apply to other section 6662 penalties, including valuation misstatement penalties, is flawed. First, if the adequate disclosure exception requirements are satisfied with respect to any item, the "portion of [any] understatement which is attributable" to that item is eliminated from the understatement amount. § 6662(d)(2)(B). Second, once the amount of the understatement is recalculated, one must determine whether a substantial understatement of income tax exists.[10] § 6662(d)(1). Third, if a

_____

[10] Section 6662(d)(1)(A) explains when a "substantial understatement in income tax" exists. The lead phrase in that subparagraph provides that the rule it sets out applies "[f]or purposes of this section," that is, for purposes of all of section 6662. Thus, whenever the phrase "substantial understatement in income tax" is used in section 6662, one must consider the rule provided in section 6662(d)(1)(A) and, accordingly, the adequate disclosure exception. However, within section 6662, the

substantial understatement of income tax exists, section 6662(b)(2) is satisfied. Fourth, pursuant to the general provision in section 6662(b), a penalty "shall apply to the portion of any underpayment which is attributable to" the substantial understatement of income tax. Finally, the substantial understatement penalty is imposed pursuant to section 6662(a).

Nowhere does section 6662 indicate that the adequate disclosure exception applies to any section 6662 penalty other than the substantial understatement of income tax penalty. This is telling, as Congress has shown that it knows how to create a clear, generally applicable exception to section 6662 penalties when it intends to. *See Kimbrough v. United States*, 552 U.S. 85, 103 (2007) ("Drawing meaning from silence is particularly inappropriate . . . [when] Congress has shown that it knows how to [address an issue] in express terms."); *United States v. Hopkins*, 106 F.4th 280, 290 (3d Cir. 2024) ("Congress knows how to create exceptions within statutes, and routinely does so."). Section 6664(c)(1)[11] provides that "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Unlike the reasonable cause and good faith exception found in section 6664(c), Congress placed the adequate disclosure exception in section 6662(d), with no text indicating that it was meant to apply to multiple section 6662 penalties. The reason for this is apparent: The adequate disclosure exception applies only to the substantial understatement penalty.

In addition, the adequate disclosure exception acts to reduce "understatement[s]" of tax. § 6662(d)(2)(B). This is unlike the general rule found in section 6662(a), which pertains to "underpayment[s]" of

phrase "substantial understatement of income tax" is used only in section 6662(b)(2) and (d).

As the Supreme Court has noted: "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017). And "[w]hen Congress want[s] to refer only to a particular subsection or paragraph, it sa[ys] so." *Id.* It did just that here, limiting the adequate disclosure exception to the substantial understatement penalty. *See* § 6662(b)(2), (d). We have no authority to alter the statute by reading the adequate disclosure exception into the rules regarding other penalties listed in section 6662(b). *See* § 6662(c), (e)(1), (f)(1), (g)(1), (j)(1), (k) (each beginning with the phrase "[f]or purposes of this section" and explaining the meaning of terms such as "negligence," "substantial valuation misstatement," and so on).

[11] Section 6664(c) is titled "Reasonable cause exception for underpayments."

tax. Relevant portions of section 6662(e) and (h) also refer to "underpayment[s]." § 6662(e)(2), (h)(1). Even portions of section 6664 that are broadly applicable to section 6662 penalties use the term "underpayment." § 6664(a), (c). If Congress had meant for the adequate disclosure exception to apply to section 6662 penalties broadly, Congress presumably would have drafted the exception to reduce *underpayments* of tax.

"Unless the statute is ambiguous, our inquiry begins and ends with the statute's plain language." *Shockley v. Commissioner*, 686 F.3d 1228, 1235 (11th Cir. 2012), *rev'g and remanding* T.C. Memo. 2011-96. Section 6662 is not ambiguous with respect to the issue in dispute. The statutory text is clear that the adequate disclosure exception does not apply to the section 6662(e) substantial valuation misstatement penalty nor to the section 6662(h) gross valuation misstatement penalty.[12]

The plain wording of section 6662(d) makes it clear that the adequate disclosure exception does not apply to the section 6662(e) substantial valuation misstatement penalty nor to the section 6662(h) gross valuation misstatement penalty.[13] Accordingly, the disclosure exception pursuant to section 6662(d)(2)(B) does not apply and therefore, petitioner is liable for the gross valuation misstatement penalty under section 6662(h). Because the gross valuation

---

[12] We have previously recognized as much. In *Hughes v. Commissioner*, T.C. Memo. 2015-89, the taxpayer "raised the substantial authority, reasonable basis, and adequate disclosure defenses" with respect to a section 6662(h) penalty in dispute. *Hughes*, T.C. Memo. 2015-89, at *33 n.11. We stated that those

> defenses are not defenses to the gross valuation misstatement penalty. *See* sec. 6662(d)(2)(B) (providing for reduction of the amount of the "understatement" computed under sec. 6662(d)(2)(A) for purposes of determining the existence of a substantial understatement of tax, by the portion of the understatement attributable to any tax position for which the taxpayer had substantial authority, or if the relevant facts were adequately disclosed on or in an attachment to the taxpayer's return, for which the taxpayer had a reasonable basis) . . . .

*Id.* We reaffirm our statement in *Hughes* with respect to the adequate disclosure exception.

[13] Petitioner raised the argument that Treasury Regulation § 1.6662-5(a) is invalid. While the provision addresses the issue in dispute, respondent did not explicitly rely on the regulation to support his position. We reached our conclusion by relying upon the statutory text.

misstatement penalty applies, we do not reach the alternative penalties determined by respondent.

V.     *Conclusion*

The value of the conservation easement on the Property is $800,000, and petitioner is liable for a 40% gross valuation misstatement penalty.  Petitioner improperly allocated its charitable contribution deductions.

We have considered the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*